____________________
                   No. 97-1739
                                             JASON BERCOVITCH, ET Al.,
                                                Plaintiffs, Appellees,
                                                                         v.
                                        BALDWIN SCHOOL, INC., ET AL.,
                                               Defendants, Appellants.
                                                   ____________________
                    APPEAL FROM THE UNITED STATES DISTRICT COURT
                                     FOR THE DISTRICT OF PUERTO RICO
                [Hon. Salvador E. Casellas, U.S. District Judge]
                                                   ____________________
                                                                    Before
                                               Torruella, Chief Judge,
                                                  Lynch, Circuit Judge,
                                      and DiClerico, District Judge.
                                                    ___________________
William Ramirez-Hernandez, with whom Nora Vargas-Acosta and
                   Vargas & Ramirez were on brief, for appellees.
Alfredo Fernandez-Martinez, with whom Maria Eugenia Rodriguez-
                   Lopez and Martinez Alvarez, Menendez Cortada & Lefranc Romero were on
                   brief, for appellants.
                                                   ____________________
                                                        January 12, 1998
                                                   ____________________
                       Of the District of New Hampshire, sitting by designation.
                         LYNCH, Circuit Judge.                                      This appeal arises out of a
dispute between a private non-special needs school, and a
student with Attention Deficit-Hyperactivity Disorder (ADHD)
and his parents.                                It requires us to decide, as a matter of
first impression in this circuit, whether a plaintiff may be
compelled to arbitrate claims under the Americans with
Disabilities Act (ADA) where the plaintiff had voluntarily
signed an agreement requiring arbitration.                                                                                 Because the
district court denied arbitration and issued a preliminary
injunction requiring the school to keep a student whom it had
suspended, this case also raises questions, again of first
impression, about the extent to which a private independent
school must accommodate a student with ADHD whose behavior
repeatedly violates school codes of discipline and proper
behavior.
                                                                         I.
                         After Jason Bercovitch committed a series of offenses
resulting in several suspensions and repeated warnings in sixth
grade (and earlier), the Baldwin School indefinitely suspended
him in January of 1997.                                         The school gave no indication as to
when he might be able to return. Jason and his parents brought
suit in federal court against the school, its Headmaster, and
Principal, seeking declaratory and injunctive relief under the
1. The Headmaster and Principal have since been dismissed
from the case, and the plaintiffs have not appealed those
dismissals.
                                                                        -22-
ADA, 42 U.S.C. § 12182 (1994), the Rehabilitation Act, 29
U.S.C. § 794 (1994), and a Puerto Rican civil rights statute.
The Bercovitches claimed that the school had failed properly to
accommodate Jason's affliction with ADHD (although they had
not previously had him diagnosed or invoked the ADA), and
therefore unlawfully discriminated against Jason on the basis
of a disability.
                         The school moved to dismiss the case and to compel
arbitration, based on an arbitration agreement between the
school and the Bercovitches.                                                  The district court denied the
motion and maintained jurisdiction over the case.                                                                                 The court
granted a preliminary injunction, ordering the school to
readmit Jason. When Jason's disruptive behavior continued, the
school              notified                  the         Bercovitches                        that           the          contract                 of
enrollment ended with the sixth grade and the school was
unwilling to reenroll him for seventh grade.                                                                    The Bercovitches
filed a contempt motion against the school.                                                                   The court did not
grant the contempt motion but extended its preliminary
injunction, ordered the school to enroll Jason in the seventh
grade, and ordered that various alterations be made in the
school's normal procedures.
2. ADHD is an increasingly common diagnosis among children
with behavioral difficulties, and is characterized by
inattention, hyperactivity, and impulsiveness. See American
Psychiatric Association, Diagnostic and Statistical Manual of
Mental Disorders 78 (4th ed. 1994).
                                                                        -33-
                         We reverse and hold, on the facts here, that the
parties are required to arbitrate the merits of this dispute
and that the district court erred in granting preliminary
injunctive relief.                                       As described later, we vacate the
injunction and refer the matter to arbitration.
                                                                        II.
                         At the beginning of this lawsuit, Jason Bercovitch
was eleven years old and in the sixth grade at the Baldwin
School. Jason is currently in the seventh grade. The Baldwin
School is an independent, non-profit, non-sectarian, English
language school located in Bayamon, Puerto Rico. It does not
have any special education programs.                                                             Jason has attended the
school since pre-kindergarten.                                                        Over the years Jason has
performed extremely well academically, but has had consistent
behavioral                    problems,                   which             the          school              made            efforts               to
accommodate.
                         In the fifth grade, Jason was placed on probation for
misconduct.                       Jason's parents met with the school Principal,
Jason's                psychologist,                         and           Jason's                teachers                  to         discuss
strategies for accommodating Jason's behavioral problems.                                                                                        The
psychologist recommended strategies for dealing with Jason,
such as extra positive reinforcement, declining to argue with
3. We use the language of "accommodation," a key concept
under both the ADA and the Rehabilitation Act, although the
Bercovitches did not claim during this period that Jason was
disabled or that the school was required to make
accommodations.
                                                                        -44-
Jason, providing Jason with time-outs or allowing him to go for
walks, and disregarding minor violations.                                                                As a result of this
meeting, the school made efforts to implement these suggestions
and to attend to Jason in an individualized manner.                                                                                    Jason's
parents came in for monthly meetings to discuss his progress.
                         In Jason's sixth grade year, a new principal entered
the school. Jason was still on disciplinary probation at this
time. In the fall of his sixth grade year, Jason's behavioral
problems became more severe; he received various disciplinary
referrals and two suspensions. Jason's behavior included the
use of disrespectful language, persistent violations of
classroom                   rules,                and          defiance                   of         teachers'                    requests.
Frequently Jason would refuse to settle down at the beginning
of class, making it impossible for the teacher to begin
lessons. He often interrupted class inappropriately, and drew
attention to himself. On numerous occasions he made derogatory
comments towards other students and teachers, including
swearing at other students and teachers, and calling his
teachers liars.
          The new principal, Nancy Pagan, met with the Bercovitches
and took several steps to accommodate Jason's individual
needs.                Ms. Pagan, on her own initiative, contacted Jason's
therapist to discuss his behavioral problems. She was
4. These steps are discussed below, at note 14.
                                                                        -55-
concerned that the efforts to accommodate Jason were not
succeeding, and his behavior was getting worse.
                         Jason's disruptive and disrespectful antics reached
a zenith on January 15, 1997, when his behavior became so
extreme and incorrigible that the school suspended him
indefinitely. This particular event started with Jason calling
a teacher unacceptable names in front of other children, after
the teacher had asked Jason to keep quiet. Jason was brought
to the Principal's office, and he denied ever saying anything
wrong. The Principal tried to discuss the matter with Jason,
but his anger grew and he began kicking the principal's desk,
screaming at the teacher in the room, and saying he did nothing
wrong.                 When the Principal phoned Mrs. Bercovitch, Jason
stormed out of the office, kicked the door, stormed down the
corridor, ripped everything off of a bulletin board, kicked a
lost and found box, and finally, at the Principal's pleading,
returned to the Principal's office.                                                             The Principal felt the
situation was completely out of control, and contacted the
Headmaster to come and meet with her and Mrs. Bercovitch.                                                                                        The
Headmaster told Mrs. Bercovitch that the school felt that it
had tried everything with Jason and had no other option but to
suspend him.
5. Jason apparently called a teacher a "jodido lucio," which
is Spanish slang and means something along the lines of
"fucking show-off."
                                                                        -66-
                         Jason's parents urged the school to reconsider its
decision to suspend Jason.                                                 They told the Headmaster, Dr.
Austen, that they suspected that Jason had ADHD, and that they
were presently having him evaluated. This was the first time
the parents asserted that their son might have a recognized
disorder. The school had earlier recommended that the parents
take Jason to be evaluated.                                               The parents did not do so until
Jason was suspended.                                      The school refused to reconsider its
position.
                         In early February of 1997, Jason's psychologist
diagnosed him with ADHD, as well as with Oppositional Defiant
Disorder (ODD), and Childhood Depression.                                                                          Jason was then
referred to a psychiatrist, Dr. Camino, who recommended
reinstatement to school, medication, and family therapy. His
written report mentioned only ADHD, and not ODD or Childhood
Depression.
                         The school refused to reinstate Jason, asserting that
all of the psychiatrist's suggestions for accommodating Jason
had been utilized in the past, unsuccessfully. The school also
maintained that having Jason in school was too disruptive for
the staff and other students.
                         On March 10, 1997, the Bercovitches filed this action
in the United States District Court for the District of Puerto
Rico.             They sought declaratory, injunctive, and compensatory
relief under the ADA, the Rehabilitation Act, and Puerto Rican
                                                                        -77-
civil rights laws. The Bercovitches asserted that ADHD was a
disability under those laws, and that the school's failure to
properly accommodate Jason constituted unlawful discriminatory
behavior. The district court held a five-day hearing beginning
on March 25 which was limited to the issue of the preliminary
injunction.                       During the preliminary injunction hearing, the
school moved to dismiss the action for lack of subject matter
jurisdiction.                          The school argued that plaintiffs failed to
exhaust their administrative remedies, which it says is
required by the ADA and the Rehabilitation Act, and that the
contract between the parties required arbitration of the
matter.                The school also moved to compel arbitration and to
dismiss the action upon arbitration.
                         On April 4, the district court, in a ruling from the
bench, denied the motion to dismiss and the motion to compel
arbitration, and granted the preliminary injunction. A written
memorandum and order was issued on April 11. The court found
that in order for Jason's behavioral problems to improve, his
ADHD needed to be treated in a school setting.                                                                                   The court
ordered the school to reinstate Jason immediately, and ordered
the parties to work together to arrive at a suitable
accommodation plan for Jason.                                                    The injunction required that
once Jason returned to school, the Bercovitches would enroll in
6. Because we reverse the preliminary injunction on other
grounds, and find that this case is required to go to
arbitration, we do not reach the exhaustion issue.
                                                                        -88-
family therapy, and Jason would begin taking medication to
control his hyperactivity.                                                 The court's order stated that
"Baldwin would not be required to make substantial changes in
its daily operations in order to accommodate Jason. . . . Jason
would not be immune from Baldwin's disciplinary rules due to
his disability." Bercovitch v. Baldwin Sch., 964 F. Supp. 597,
603 (D.P.R. 1997). The court also stated:
                         [A]lthough the Court is convinced of the
                         reasonableness                                 of              the                forgoing
                         accommodations, Baldwin will not be forced
                         to          unconditionally                              serve               Jason               if
                         accommodating him ceases to be reasonable;
                         that is, if after a reasonable amount of
                         time, it is determined that the prescribed
                         treatment has failed to improve Jason's
                         behavior in any significant manner. This
                         Court will thus retain jurisdiction over
                         this matter until at least June of 1997,
                         when a permanent injunction hearing shall
                         be heard.                       At that point, the parties
                         shall discuss Jason's response to his
                         pharmacological                              and            psychotherapeutic
                         treatment so far.
Id. at 606-07. The court also granted attorneys' fees to the
Bercovitches.
                         Jason returned to school on April 7.                                                               On that day
Jason's parents met with the school Headmaster, Principal, and
Jason's                teachers.                   The          school               agreed               to        a       variety                of
accommodations for Jason.                                             Two weeks later, another meeting
took place which included Jason's treating physician.                                                                                         As a
result of the meeting, the school drafted a behavioral
accommodation plan, which the Bercovitches refused to sign
because it required Jason to comply with the school's code of
                                                                        -99-
conduct.                       Several                 additional                    attempts                  at         devising                 an
accommodation plan failed.                                                In late April, Jason's parents
requested that Jason be re-enrolled in Baldwin School for the
following academic year -- Jason's seventh grade year.                                                                                           The
school stated that it did not intend to re-enroll Jason, given
his continued defiance and difficulty in school since the court
ordered reinstatement.
                         The Bercovitches sought to hold the school in
contempt of the original April 4 preliminary injunction for
failure to accommodate Jason, and to order the school to re-
enroll Jason for the following year. After oral arguments on
the motions, the court issued an order on June 4, 1997, denying
the contempt motion but extending the preliminary injunction
and granting the motion to order re-enrollment.
                         Although the court did not amend the language of its
original preliminary injunction order which indicated that
Jason would not be immune from the school's disciplinary rules,
the court's extension of the preliminary injunction, as well as
its later "proposed accommodation plan" for Jason, amounted to
a de facto modification of that original order.                                                                              The court's
plan incorporated the parents' demand that Jason not be subject
to the same rules of suspension and expulsion as the other
children. See infra, pp. 27-28 (discussing the plan).
                         Currently, Jason is in his seventh grade year at the
Baldwin School. Since Jason returned to school pursuant to the
                                                                       -1100-
district court's preliminary injunction, the record before us
shows that Jason's behavioral situation has improved little, if
at all.                We assume Jason has been on medication, but it has
made no difference, on this record. Jason's post-reinstatement
behavior has included aggressive conduct towards peers and
teachers. He frequently speaks during class and provokes other
students.                     He has tremendous difficulty working with other
students, and usually must be separated from them. He defies
teachers' orders to quiet down or leave the room, annoying
other students and frustrating teachers.                                                                      On one occasion,
7. As part of Jason's reinstatement, the school agreed to
have all of Jason's teachers fill out forms assessing Jason's
behavior on a daily basis. Time after time the forms
indicate that Jason was "uncontrollable," "disruptive," and
"excitable." During one class Jason called another child a
"doofus" after that child failed to answer a question
correctly. The forms indicate that Jason argued frequently
with other students, and refused to follow the teachers'
instructions to quiet down. Jason often spoke out of turn,
shouting answers to questions without being called upon.
Jason often refused to step outside the classroom when asked
by a teacher to do so. There were frequent "interruptions"
by Jason in the middle of class. One teacher wrote that
during science class "[m]any different times throughout the
period, I had to call Jason aside and ask him to calm down
and show respect to his peers giving presentations."
          One teacher wrote that just as she was about to begin
Spanish class, she saw Jason pushing another student. The
students were fighting over a desk. The teacher told them
neither one could have the desk, at which point the other
student sat elsewhere. Jason got extremely upset and began
yelling at the teacher, refusing to move from the desk.
Jason called the teacher a Spanish swear word. Jason later
refused to give the teacher his work, and when she demanded
it from him he threw it on her desk, then ripped it up and
stormed out of the room. The additional incidents of
fighting, abusive language, and provocation are too numerous
to list.
                                                                       -1111-
Jason acted with extreme disrespect towards his father in the
school courtyard, yelling and kicking.
                         The          Headmaster                    says           he         has          "had           to        dedicate
approximately thirty percent of [his] time to [Jason's]
affairs" since Jason has returned to school.                                                                    The Headmaster's
affidavit states that he understands that because of the court
order he is not permitted to expel Jason, but that "[i]f it
were not for the court's orders and instructions, shortly after
his reinstatement on April 7, 1997, Jason would have been
expelled                 for          misconduct.                           Jason             continues                   to        have           no
significant                      problem                learning                  and           meeting                the          academic
requirements, but, he has failed substantially and repeatedly
to behave in accordance with the standards of conduct."
                         The parties have engaged in a battle of blaming, both
asserting that the other is not in compliance with the district
court's injunction.                                  Neither party is satisfied with Jason's
progress. The school still seeks to compel arbitration of the
merits of this dispute. The district court, however, has not
sent the case to arbitration but rather has maintained
jurisdiction over it.                                       Despite the language of its original
injunction, the subsequent orders of the court made it evident
that the school could not apply its normal disciplinary or
conduct rules to Jason.                                          A permanent injunction hearing was
originally scheduled for September, 1997, but the court
postponed the hearing indefinitely pending this appeal.
                                                                       -1122-
                         The school appeals from the denial of the motion to
compel arbitration, the initial entry of the preliminary
injunction, and from the extension of that preliminary
injunction ordering reenrollment of Jason in the seventh grade.
                                                       III. Arbitration
                         In 1996, the Bercovitches entered into an enrollment
agreement with the school. Clause 5 of that agreement provides
that "[t]he Parents, for themselves and in [sic] behalf of the
Student[s], agree to abide by the By-Laws of the School . . .
[c]opies [of which] are available for review at the school main
office."                 The school's by-laws provide for final and binding
arbitration of any dispute regarding the school's rules,
regulations, or policies.                                                Additionally, Clause 11 of the
enrollment agreement provides that "[a]ny and all disputes
8. Article XI of the By-Laws is entitled "Dispute
Resolution, Arbitration," and states:
                         Any and all disputes arising out of these
                         By-Laws or their application or the
                         application of any rule, regulation,
                         policy, resolution or act or contract
                         implemented or carried out pursuant to
                         these By-Laws shall be resolved, in the
                         first instance, by the person charged
                         with the responsibility for the
                         application or implementation of such.
                         Any interested party affected adversely
                         by the initial resolution of the
                         controversy dissatisfied with the initial
                         determination must submit their position
                         in writing to the board of directors,
                         which, by itself or through such person
                         or persons designated for such purposes
                         and, after due process, will resolve the
                         dispute and such determination will be
                         final and binding.
                                                                       -1133-
arising under this contract must be resolved by submission to
arbitration" pursuant to the school's by-laws.                                                                                The school
argued in the district court, and now on appeal, that these
provisions require the Bercovitches to submit their statutory
claims to arbitration, and deprive the district court of
jurisdiction over the merits of the dispute.
                         The Bercovitches neither claimed that their agreement
to the terms of this contract was involuntary, nor that they
otherwise signed the agreement without knowledge of its
arbitration provisions.                                           Instead, they assert that because
their claims are based on the school's violation of the ADA --
a civil rights statute -- their claims are not subject to
mandatory arbitration despite the existence of a valid
arbitration agreement.
                         The            district                   court               found               that              under               the
circumstances, the Federal Arbitration Act, 9 U.S.C. §§ 1-14
(1994) ("FAA"), did not require it to compel arbitration.                                                                                        The
court held that it had jurisdiction to issue a preliminary
injunction even in an arbitrable dispute in order to preserve
the status quo pending arbitration.                                                           The court did not order
arbitration, however, and thus the injunction cannot be
justified on the grounds of preserving the status quo pending
arbitration.
                         The district court's refusal to compel arbitration
was based on a legal determination, which we review de novo.
                                                                       -1144-
See Unum Corp. v. United States, No. 96-1877, 1997 WL 735315,
at *1 (1st Cir. Dec. 2, 1997). The FAA required the court to
compel arbitration of the merits of the dispute. The court was
in error, therefore, in refusing to compel arbitration.
A. Strong Federal Policy Favoring Arbitration -- the FAA
                         The issue of arbitrability must be analyzed in light
of the strong public policy favoring arbitration, and the
strong policies behind the ADA and the Rehabilitation Act. See
Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473
U.S. 614, 626 (1985); Moses H. Cone Mem'l Hosp. v. Mercury
Constr. Corp., 460 U.S. 1, 24-25 (1983).                                                              Congress enacted the
FAA in 1925 to overcome centuries of judicial hostility to
arbitration agreements, see Dean Witter Reynolds Inc. v. Byrd,
470 U.S. 213, 219-21, & n.6 (1985), and intended courts to
enforce arbitration agreements and to "place such agreements
upon the same footing as other contracts."                                                                                Allied-Bruce
Terminix Cos. v. Dobson, 513 U.S. 265, 271 (1995) (citations
and internal quotation marks omitted).
                         The FAA provides that "a contract evidencing a
transaction involving commerce to settle by arbitration a
controversy thereafter arising out of such contract . . . shall
be valid, irrevocable, and enforceable, save upon such grounds
as exist at law or in equity for the revocation of any
contract." 9 U.S.C. § 2 (1994). "Commerce" is broadly defined
in this context, and is coextensive with the reach of
                                                                       -1155-
Congress's Commerce Clause power.                                                        See Allied-Bruce Terminix
Cos., 513 U.S. at 268 (construing the reach of the FAA "to the
limits of Congress' Commerce Clause power"). The FAA clearly
covers the enrollment agreement between the parties in this
case -- an agreement to pay money for educational services.
The parties do not dispute the facial applicability of the FAA.
                         If there are no questions as to the validity of the
arbitration                      agreement                   itself,               a       court             asked             to        compel
arbitration must determine whether the arbitration agreement in
fact covers the dispute in question (assuming the agreement
does not assign that question to the arbitrator).                                                                                 See First
Options v. Kaplan, 514 U.S. 938, 943 (1995); Mitsubishi Motors
Corp., 473 U.S. at 626 (1985).                                                    In construing an arbitration
agreement, "questions of arbitrability must be addressed with
a healthy regard for the federal policy favoring arbitration."
Moses H. Cone, 460 U.S. at 24.
                         The Bercovitches do not argue that their dispute does
not fall within the literal terms of the arbitrability clause.
The agreement between the parties here -- to arbitrate "[a]ny
and all disputes arising out of [the school's] By-Laws or their
application or the application of any rule, regulation, policy,
resolution or act or contract implemented or carried out
pursuant to these By-Laws" -- covers the claims that the
Bercovitches have brought against the school. The Bercovitches
have disputed the application of the school's disciplinary
                                                                       -1166-
policies to Jason.                                       This is clearly a grievance with a
"regulation" or "policy" and under the FAA is subject to
compulsory arbitration.
B. Arbitrability of ADA Claims
                         That the Bercovitches' claims are based on a civil
rights statute does not take them outside the reach of the FAA.
That was made clear by the Supreme Court case of Gilmer v.
Interstate/Johnson Lane Corp., 500 U.S. 20 (1991), which
rejected arguments, based on earlier cases, to that effect.
                         In Alexander v. Gardner-Denver Co., 415 U.S. 36
(1974), the Court held that an employee was not precluded from
bringing his Title VII claim in federal court, despite the
existence of an arbitration clause in a collective bargaining
agreement, and the employee's prior submission of his claim to
arbitration. In subsequent cases, the Court held a variety of
non-civil                   rights              statutory                   claims              subject                to         mandatory
arbitration.                        See, e.g., Shearson/American Express, Inc. v.
McMahon,                  482          U.S.            220          (1987)              (holding                  enforceable                      an
arbitration agreement for claims arising under the Securities
Exchange Act of 1934 and the Racketeer Influenced and Corrupt
Organizations Act); Mitsubishi Motors Corp., 473 U.S. 614
(holding enforceable an arbitration agreement for claims
arising under federal antitrust laws); Scherk v. Alberto-Culver
Co., 417 U.S. 506 (1974) (holding enforceable an arbitration
                                                                       -1177-
agreement for claims arising under the Securities Exchange
Act).
                         In Mitsubishi, the Court stated that once it was
clear that the "parties' agreement to arbitrate reached the
statutory issues," a court must then consider "whether legal
constraints external to the parties' agreement foreclosed the
arbitration of those claims."                                                    473 U.S. at 628.                                The Court
decided that nothing in the text, history, or policy of the
antitrust laws precluded a waiver of a judicial forum, and that
despite the complexity of issues an arbitral forum was adequate
to address antitrust claims. See id. at 633-34. Until Gilmer,
however, it was unclear whether the Court's analysis of the
arbitrability of non-civil rights statutes, outside the context
of a collective bargaining agreement, would apply equally to
civil rights claims.                                      Gilmer answered this question in the
affirmative.
                         In Gilmer, the Court reiterated the "'liberal federal
policy favoring arbitration agreements,'" 500 U.S. at 25
(quoting Moses H. Cone, 460 U.S. at 24), and rejected Gardner-
Denver's position that the arbitral forum, as a general matter,
was not adequate to address the policies and intricacies of
civil rights statutes -- specifically the Age Discrimination in
Employment Act of 1967 (ADEA), 29 U.S.C. § 621 et seq.                                                                                           The
petitioner in Gilmer had, as a term of his employment as a
financial                   services                 manager,                  registered                    as        a       securities
                                                                       -1188-
representative with the New York Stock Exchange under an
agreement requiring arbitration of disputes. See Gilmer, 500
U.S. at 23. The Court found that this agreement -- strikingly
similar to the agreement here -- covered Gilmer's ADEA claim
and was enforceable. See id. at 26-27.
                         The Court did indicate that there might be some cases
in which the arbitral setting is an inappropriate forum for the
resolution of statutory claims, but placed the burden squarely
on the plaintiff to prove that this is so. See id. at 26
(stating that a party should be held to its own bargain to
arbitrate unless it can show Congress intended to preclude a
waiver of a judicial forum for the statutory claims at issue).
If Congress intended to preclude a waiver, that intention would
be discoverable in the text or legislative history of the
statute, or in an "inherent conflict" between arbitration and
the underlying goals of the statute. See id.
9. The Court found nothing in the text or legislative
history of the ADEA that would preclude a waiver, and did not
find any inherent inconsistency between the ADEA's policies
and enforcing an agreement to arbitrate age discrimination
claims. See id. at 27-30 (rejecting petitioner's claim that
arbitration would interfere with the EEOC's enforcement of
the ADEA, and his generalized attacks on the adequacy of
arbitration procedures). The Court additionally noted that
arbitrators were fully competent and authorized to provide
the full panoply of remedies afforded by the ADEA, including
equitable relief. See id. at 32. The Court appeared to
leave the door open, however, to more specific challenges to
arbitral proceedings, such as specific bias in the selection
of arbitrators or lack of procedural protections. See id. at
30. We note that in the case before us, the Bercovitches
have made no general, let alone specific, claims of bias or
unfairness as to the arbitral forum where their claims would
                                                                       -1199-
                         Gilmer controls this case.                                                       The burden is on
plaintiffs to prove that Congress, in enacting the ADA,
intended to preclude a prospective waiver of a judicial forum
for ADA claims. In order to carry this burden, plaintiffs must
point to something in the text or legislative history of the
ADA that precludes enforcement of arbitration agreements as to
ADA claims, or show an "inherent conflict" between the policies
and purposes of the ADA and mandatory arbitration.
                         Gilmer               does           not           appear              to         have            changed                the
traditional rule that courts look first to the text of a
statute, and then to the legislative history if the meaning of
the text is ambiguous.                                        See Caminetti v. United States, 242
U.S. 470, 485 (1917); United States v. Bohai Trading Co., 45
F.3d 577, 581 (1st Cir. 1995).                                                  The plain language of the text
of the ADA contemplates arbitration, there is no inherent
conflict, and while the legislative history evidences a concern
that           agreements                     to        arbitrate                   should              be         voluntary,                    the
Bercovitches do not claim the agreement was not voluntary.
                         Unlike the ADEA, the ADA expressly encourages
arbitration of disputes. Section 12212 of the ADA states that,
                         [w]here appropriate and to the extent
                         authorized by law, the use of alternative
                         means of dispute resolution, including ...
                         arbitration, is encouraged to resolve
                         disputes arising under this chapter.
be heard.
                                                                       -2200-
42 U.S.C. § 12212.                                   The meaning of this language, far from
evidencing an intention to preclude arbitration, can only be
interpreted as favoring it.                                                        If this language were not
interpreted to permit prospective waiver of a judicial forum,
it would be superfluous.                                            Litigants are always permitted to
resolve their disputes extrajudicially, with or without
statutory language authorizing such action. This language adds
nothing if it does not mean that litigants can anticipatorily
waive a judicial forum for ADA claims.                                                                See Babbitt v. Sweet
Home Chapter, 515 U.S. 687, 698 (1995) (statutory language is
not to be treated as surplusage).
                         Despite this clear language, plaintiffs assert that
certain sections of the legislative history of the ADA,
although not the text, prove that Congress intended to preclude
mandatory arbitration of ADA claims.                                                                  The House Judiciary
Committee Report, incorporated by reference into the House
Conference Report, discusses the ADA alternative dispute
resolution section as follows:
                                     This section encourages the use of
                         alternative means of dispute resolution,
                         where             appropriate                      and          to        the          extent
                         authorized by law. These methods include
                         . . . arbitration.
10. We note that in dealing with disabled children and
public education obligations in the context of the
Individuals with Disabilities in Education Act, 20 U.S.C. §
1400 et seq. (1994), Congress also encouraged a number of
meetings and methods of resolving potential disputes between
parents and schools before there can be resort to a judicial
forum.
                                                                       -2211-
                                     .       .       .       The          Committee                   wishes              to
                         emphasize,                    however,                  that           the          use          of
                         alternative dispute resolution mechanisms
                         is intended to supplement, not supplant,
                         the remedies provided by this Act. Thus,
                         for example, the Committee believes that
                         any agreement to submit disputed issues to
                         arbitration, whether in the context of a
                         collective bargaining agreement or in an
                         employment contract, does not preclude the
                         affected person from seeking relief under
                         the enforcement provisions of this Act.
                         This view is consistent with the Supreme
                         Court's interpretation of title VII of the
                         Civil Rights Act of 1964, whose remedial
                         provisions are incorporated by reference
                         in title I.                       The Committee believes that
                         the approach articulated by the Supreme
                         Court in Alexander v. Gardner-Denver Co.
                         applies equally to the ADA and does not
                         intend that the inclusion of Section 513
                         [the ADA arbitration section] be used to
                         preclude rights and remedies that would
                         otherwise be available to persons with
                         disabilities.
H.R.            Rep.           No.           101-485(III)                       (1990),                reprinted                    in        1990
U.S.C.C.A.N. 445, 499 (footnote omitted). See also H.R. Rep.
No. 101-596 (1990), reprinted in 1990 U.S.C.C.A.N. 445, 598.
                         In light of the language in the ADA text itself, this
legislative history is not sufficient to rebut the presumption
in favor of arbitration.                                             This language, which was drafted
prior to the Gilmer decision, appears simply to endorse and
track             Supreme                Court            precedent                   on         the         question                  of        the
arbitrability of civil rights claims. The committees appear to
have been concerned with the issues dealt with in Gardner-
Denver: the unfairness of enforcing arbitration agreements in
collective bargaining agreements or employment contracts that
                                                                       -2222-
the individual plaintiff may have had no knowledge of or
influence over.                                 It expresses a concern for involuntary
agreements to arbitrate.                                          We reiterate that the Bercovitches
have made no claim that their agreement to arbitrate was
somehow involuntary, nor is there any evidence of such
unfairness.
                         Finally, we do not find any "inherent conflict"
between mandatory arbitration of ADA claims and the policies
behind the ADA.                                The ADA condemns discrimination based on
disability, just as the ADEA condemns discrimination based on
age. Gilmer found that arbitrators are competent to interpret
age discrimination statutes and the policies behind them, as
well as to award all the relief authorized by the statutes.
There is no reason to think that the ADA presents a stronger
policy case against arbitration than ADEA, and many reasons to
think it does not.
                         If anything, the ADEA evinces a stronger policy
against a prospective waiver of a judicial forum than does the
ADA. In contrast to the ADA, the plain language of the ADEA,
as amended by the Older Workers Benefits Protection Act in 1990
(before Gilmer was argued or decided), expressly requires that
any waiver of rights under the ADEA be knowing and voluntary.
See 29 U.S.C. § 626(f) (1994).                                                    It also specifically defines
the conditions under which a waiver may be knowing and
                                                                       -2233-
voluntary.                      The ADA does not have any express protections
against waiver of rights under the ADA.
                         In the end, this case is not distinct enough from
Gilmer to persuade us that the ADA precludes a waiver of a
judicial forum through a voluntary prospective agreement to
arbitrate. Although the issue of arbitrability of an ADA claim
is one of first impression in this circuit, at least one of our
sister circuits agrees with us. See Miller v. Public Storage
Management, Inc., 121 F.3d 215, 218 (5th Cir. 1997) (holding
ADA claim subject to arbitration and stating that the explicit
language of the ADA "persuasively demonstrates Congress did not
intend to exclude the ADA from the scope of the FAA").
Plaintiffs have waived a judicial forum, by their own bargain,
and must now submit their ADA and Rehabilitation Act                                                                                     claims
to arbitration.
                                          IV. Preliminary Injunction
                         We agree that the district court had jurisdiction to
issue a preliminary injunction to preserve the status quo
pending arbitration. See Teradyne, Inc. v. Mostek Corp., 797
F.2d 43, 51 (1st Cir. 1986) ("[A] district court can grant
injunctive relief in an arbitrable dispute pending arbitration,
provided                  the           prerequisites                          for          injunctive                      relief               are
11. Nothing in the Rehabilitation Act evidences a
Congressional intent to preclude arbitration, even assuming
dubitante that the Rehabilitation Act provides jurisdiction
here. See infra, note 13.
                                                                       -2244-
satisfied.").                            But that is not what the district court did.
Nonetheless, the question remains of the appropriateness of
preliminary injunctive relief to preserve the status quo
pending arbitration. We turn to whether plaintiffs met their
burden of justifying preliminary injunctive relief.
                         A trial court's decision to issue a preliminary
injunction in an ADA case, as in all cases, must be based on
four factors: (1) the likelihood of success on the merits; (2)
the potential for irreparable harm if the injunction is denied;
(3) whether the balancing of hardships favors the issuance of
the injunction; and (4) what effect, if any, the issuance or
non-issuance of the injunction will have on the public
interest. See EEOC v. Astra USA, Inc., 94 F.3d 738, 742 (1st
Cir. 1996) (Title VII); Gately v. Massachusetts, 2 F.3d 1221,
1224 (1st Cir. 1993) (ADEA).                                                We review the district court's
grant of a preliminary injunction with deference, and will
affirm unless the court committed a mistake of law or abused
its discretion. See Astra USA, 94 F.3d at 743. We find that
12. The Teradyne court further stated:
                         We believe this approach reinforces
                         rather than detracts from the policy of
                         the Arbitration Act [and that] the
                         congressional desire to enforce
                         arbitration agreements would frequently
                         be frustrated if the courts were
                         precluded from issuing preliminary
                         injunctive relief to preserve the status
                         quo pending arbitration and, ipso facto,
                         the meaningfulness of the arbitration
                         process.
Id. (citations omitted).
                                                                       -2255-
the district court misapprehended certain aspects of the law
under the ADA and the Rehabilitation Act, and abused its
discretion in granting injunctive relief. Because we find
plaintiffs did not meet their burden on likelihood of success,
we do not reach the other factors.
                         The          plaintiffs                    did          not          meet           their             burden              of
demonstrating probability of success on the merits in at least
three respects.                                 The district court's conclusion to the
contrary is based in part on errors of law.                                                                                 First, even
assuming that Jason has a disability within the meaning of the
ADA,           the alterations in the school's normal requirements and
standards that were sought by the plaintiffs and imposed by the
district court went far beyond the "reasonable accommodations"
required by statute. It was beyond the power of the district
court to order a school to suspend its normal codes of conduct
in order to tolerate disruptive and disrespectful conduct when
13. As noted earlier, plaintiffs brought their claims under
both the ADA and the Rehabilitation Act. The Rehabilitation
Act applies only if the Baldwin School is a recipient of
federal funds. We are doubtful that Baldwin achieves that
status by mere receipt of some small amount of educational
computer material from the Commonwealth of Puerto Rico, which
the Commonwealth buys with federal funds. We need not decide
the issue of applicability of the Rehabilitation Act in light
of our disposition.
          For present purposes, we treat the ADA and the
Rehabilitation Act as imposing parallel requirements. See
E.E.O.C. v. Amego, Inc., 110 F.3d 135, 143 (1st Cir. 1997)
(citing 29 U.S.C. § 794(d)); Katz v. City Metal Co., 87 F.3d
26, 31 n.4 (1st Cir. 1996) (noting that § 504 of the
Rehabilitation Act "is interpreted substantially identically
to the ADA.").
                                                                       -2266-
that behavior impaired the educational experience of the other
students and significantly taxed the resources of the faculty
and administration.                                    Second, the district court applied an
incorrect standard and plaintiffs did not meet their burden of
showing probability of success that Jason was "otherwise
qualified."                      Third, plaintiffs did not, on this record, meet
their burden of showing probability of success that Jason is
disabled within the meaning of the Act.
A. Reasonable Accommodations
                         If the requested accommodations call for "substantial
modifications" of defendant's program, the accommodations are
not reasonable, and will not be required.                                                                       See Southeastern
Community College v. Davis, 442 U.S. 400, 405 (1979) ("Section
504 [of the Rehabilitation Act] by its terms does not compel
educational institutions to disregard the disabilities of
handicapped individuals or to make substantial modifications in
their programs to allow disabled persons to participate.");
Wynne v. Tufts Univ. Sch. of Med., 976 F.2d 791, 794-95 (1st
Cir.            1992)             (medical                 school               was          not          required                  to        make
accommodations for learning disabled student where such
accommodations would substantially alter the program or lower
academic standards).
                         Here, the plaintiffs insisted that Jason be exempted
from the normal operation of the school's disciplinary code.
Although the court expressly stated in its preliminary
                                                                       -2277-
injunction order that Jason "would not be immune from Baldwin's
disciplinary rules," its own "accommodation plan" implemented
the parents' desire that Jason only be suspended after at least
three warnings, and then only for the remainder of the day.
Thus, the normal progressive discipline built into the school's
code was enjoined and the school was effectively enjoined from
suspending Jason, as it would any other student, for repeated
disruptive behavior.
                         This was an alteration of a fundamental requirement
of the school's academic program and as such is not required by
the ADA. See 42 U.S.C. § 12182(b)(2)(A)(ii) (1994). This is
not a case of a single or minor disciplinary code violation
resulting from a disability and which could be accommodated
with a non-fundamental adjustment.                                                              Indeed, the record is
replete with efforts by the school to make adjustments,                                                                                   hoping
14. To give some examples: In sixth grade Jason created a
disturbance in music class and stopped the music teacher from
conducting her lessons. The music teacher called the
Principal, Ms. Pagan, who took Jason out of class and spoke
with him. Jason stated that he hated music class, and
refused to ever go again. Ms. Pagan made a deal with Jason
that if he went to three music classes, he could elect not to
go to the fourth. Ms. Pagan testified at the preliminary
injunction hearing that it was not at all customary to make
such deals with children, but that she was familiar with
Jason's difficulties and she "wanted to work with him in a
positive way."
            On another occasion, Jason was brought to the
principal's office because he and another student had been
arguing and swearing during recess. The punishment for both
was that recess would be revoked for the following day. The
other student complied; Jason flatly refused to miss recess,
saying it was not his fault. Ms. Pagan initially insisted on
her original punishment, but ultimately offered Jason an
                                                                       -2288-
to        alter             Jason's                intolerable                      behavior.                        All          of        these
accommodations                           came           to         naught,                 as        Jason's                 disruptions
continued.
                         The Baldwin School is a private college preparatory
school. Like other private schools, it is covered by Title III
of the ADA as a place of public accommodation.                                                                       That a private
non-special needs school is covered by the ADA does not, as a
matter of law, transform it into a special needs school. The
Baldwin School is not equipped to handle special needs students
with severe behavioral problems.                                                  Despite the district court's
order that Baldwin create an individualized "accommodation
plan" for Jason which creates special treatment for Jason, the
ADA          imposes                 no         requirement                      on         Baldwin                 to        devise               an
individualized education plan such as the IDEA requires of
public schools.                              The district court order comes perilously
alternative penalty: instead of missing recess he could pick
up ten pieces of trash from the school yard. Jason agreed,
and got to have his recess. As to this accommodation, Ms.
Pagan again testified that it was not customary, but that she
"was trying to do everything possible to have Jason have a
good sixth grade year. [She] was trying to work with him
from the conversation that [she] had with Mr. and Mrs.
Bercovitch in bringing out the positive."
            After another incident when Jason used disrespectful
language toward a teacher and interrupted class, there was a
meeting with Jason's parents. Mr. Bercovitch suggested
positive reinforcement and moving Jason's desk to the back of
the room. The principal agreed. On a regular basis Ms.
Pagan would speak with Jason, ask him if he was having a good
day, tell him she was proud of him for his good work and for
behaving appropriately.
            Despite these accommodations, Jason's disruptive
behavior continued.
                                                                       -2299-
close to confusing the obligations Congress has chosen to
impose on public schools with those obligations imposed on
private schools.
                         The district court also erred in not appropriately
crediting the judgment of the educational officials. As this
court noted in Wynne, 976 F.2d at 795, the decision by the
school               here           was           entirely                 reasonable                     "that             no         further
accommodation could be made without imposing an undue (and
injurious) hardship on the academic program." Here, there is
not a shred of evidence of discriminatory intent toward
disabled persons on the part of the school.                                                                   There is not even
a whisper of a suggestion of stereotyping based on handicap.
Care should be taken before a court in these circumstances
substitutes its judgment for that of the school.                                                                               See Amego,
110 F.3d at 145; cf. School Bd v. Arline, 480 U.S. 273, 288
(1987) (noting that deference should be given to judgment of
public officials as to whether a plaintiff is "otherwise
qualified").
                         Because the preliminary injunction went far beyond
the requirements of reasonable accommodation, it was in error.
The events after the issuance of the initial injunction only
confirm the error. Nothing changed after Jason was reinstated,
despite the school's efforts to comply with the court's order
and despite Jason being on medication and under professional
                                                                       -3300-
care.                       According                    to         the           Headmaster,                       since              Jason's
reinstatement, his continued misconduct and the school's
inability, under the injunction, to discipline Jason, have lead
to a significant consumption of staff time and a staff morale
problem. Jason's teachers are unable to teach effectively and
15. Examples of Jason's unacceptable behavior following
reinstatement include: During an assembly, Jason and another
student engaged in a shoving and name-calling match,
requiring teachers to separate them. During a music class
Jason was speaking out of turn and the teacher asked him to
quiet down, at which point Jason stated he wanted to switch
seats; after the teacher denied his request Jason asked the
teacher, in front of the whole class, what was the teacher's
problem and whether she was "going through a divorce or
something like that." The music teacher told Jason to go to
the office, which he refused to do, and when the teacher took
his arm he threw himself onto the floor in defiance of the
teacher's requests. During a language arts class Jason
completed an exam early, and began talking and disturbing
others still taking the exam. The teacher asked him to keep
quiet, and he became agitated and argued with the teacher.
The teacher asked him to leave the room, and he refused.
                                                                       -3311-
other students are suffering.                                                        The Headmaster's affidavit
states that
                         other students in Jason's classes show
                         increasing anger and frustration at the
                         continued disruption of the classes by
                         Jason.                  The situation at the school,
                         related                 to         this             student,                  from             the
                         standpoint                    of         administration                           and          the
                         providing                    of          its           usual               educational
                         services in the classes he is attending,
                         has          become                extremely                    disruptive                     and
                         burdensome.
Accommodating Jason was and continues to be unduly burdensome
and costly for the school. Rather than extend the injunction
to require enrollment of Jason for the next year, the district
court should have, in the face of such evidence, vacated the
preliminary injunction.
B. "Otherwise Qualified"
16. An incident during a language arts class provides a good
illustration of the upsetting and frequently disabling nature
of Jason's behavior. After class Jason's teacher wrote:
                         Jason was extremely wound up. . . . Jason
                         was screaming at outrageous levels in
                         order to be heard. Whenever Jason did
                         this, I stopped what I was saying until
                         Jason quieted down. Other students were
                         very frustrated with Jason and asked him
                         in relaxed tones to please quiet down
                         because they were trying to concentrate.
                         Jason always had a comment back to them
                         in Spanish. With about 25 minutes to go
                         in the period, it reached the point where
                         Jason was uncontrollable and we, as a
                         class, could not continue with the lesson
                         I planned for the day. We spent the rest
                         of the period working on drawing comic
                         strips dealing with self-respect and
                         courage.
                                                                       -3322-
                         The district court erroneously stated and applied the
standard for whether a plaintiff is "otherwise qualified" for
purposes of these acts.
                         Although the plaintiffs have not raised this point,
we note there is an initial question about the role played by
the "otherwise qualified" test under Title III of the ADA.
Title III states that "[n]o individual shall be discriminated
against on the basis of a disability in the full and equal
enjoyment of the goods, services, facilities, privileges,
advantages,                      or         accommodations                           of        any          place              of        public
accommodation . . . ." 42 U.S.C. § 12182(a) (1994). Notably,
it does not use the "qualified individual" language that Titles
I and II use. See 42 U.S.C. § 12112 (1994) (Title I covering
employment) ("No covered entity shall discriminate against a
qualified                   individual                    with           a       disability                     because                of        the
disability of such individual in regard to job application
procedures [or other employment procedures].") (emphasis
added); 42 U.S.C. § 12132 (1994) (Title II covering public
services) ("[N]o qualified individual with a disability shall,
by reason of such disability, be excluded from participation in
or be denied the benefits of the services, programs, or
activities of a public entity . . . .") (emphasis added).
Neither the First Circuit nor the Supreme Court have ruled on
the significance of this distinction.                                                                           We find little
difference in this distinction, because many of the issues that
                                                                       -3333-
arise in the "qualified" analysis, also arise in the context of
the "reasonable modifications" or "undue burden" analysis.
That is, if more than reasonable modifications are required of
an institution in order to accommodate an individual, then that
individual is not qualified for the program.
                         Further, the ADA expressly provides that it be
enforced in a manner consistent with the requirements of the
Rehabilitation Act.                                   See 42 U.S.C. § 12117(b) (1994).                                                        This
court has interpreted the two acts similarly. See Amego, 110
F.3d at 143; Katz, 87 F.3d at 31 n.4.                                                                         And Congress has
mandated that nothing in the ADA shall be construed to apply a
lesser standard than under Title V of the Rehabilitation Act.
See 42 U.S.C. § 12201(a) (1994).
                         Under             the          Rehabilitation                          Act,            in        Southeastern
Community College, 442 U.S. at 405, the Supreme Court expressly
rejected an interpretation of "otherwise qualified" that would
prohibit an institution from considering an individual's
limitations when determining that person's eligibility for an
academic program.                                     The Court stated that "an otherwise
qualified person is one who is able to meet all of a program's
requirements in spite of his handicap." Id. at 406 (emphasis
added).                  The law does not require an academic program to
compromise its integral criteria to accommodate a disabled
individual. See id.
                                                                       -3344-
                         In contrast, the district court articulated the
standard as a "but for" one:                                                The court found that Jason was
"but for his disability, clearly or otherwise qualified to
participate in Baldwin School's educational program.                                                                                             His
conduct cannot be the measure of his qualification because his
conduct is, to a significant extent, a manifestation of his
disability." Bercovitch, 964 F. Supp. at 602. This was error.
                         Plaintiffs did not meet their burden of showing on
preliminary injunction a probability of success that Jason was
"otherwise qualified."                                       As Baldwin correctly points out, the
district court focused on only two of the school's requirements
for admission/retention -- academic performance and payment of
tuition -- and ignored the school's conduct and disciplinary
requirements. A school's code of conduct is not superfluous to
its proper operation; it is an integral aspect of a productive
learning environment.                                       Therefore Jason cannot be "otherwise
qualified" unless, with reasonable accommodations, he can meet
disciplinary requirements.                                                   As the discussion regarding
reasonable accommodations makes clear, plaintiffs did not meet
this burden.
C. Disability
                         In order to obtain an injunction, plaintiffs also had
the burden of showing they were likely to succeed in
establishing Jason was "disabled" within the meaning of the
ADA.            See Jacques v. Clean-Up Group, Inc., 96 F.3d 506, 511
                                                                       -3355-
(1st Cir. 1996); Katz, 87 F.3d at 30-31.                                                              While plaintiffs may
be able to make such a showing before the arbitrator, there is
a higher burden -- probability of success -- at the preliminary
injunction stage. See Feinstein v. Space Ventures, Inc., 989
F.2d 49, 51 (1st Cir. 1993) (reversing grant of preliminary
injunction where plaintiff failed to establish probability of
success on the merits). At best the evidence of record shows
a draw.
                         "Disability" has a specific legal meaning.                                                                              The
statutory terms require that there be "a physical or mental
impairment that substantially limits one or more of the major
life activities."                             42 U.S.C. § 12102 (1994); 29 U.S.C. § 706(8)
(1994).                  Plaintiffs' evidence must satisfy three distinct
factors:                 (1) Jason has a physical or mental impairment; (2)
which affects a major life activity; (3) to a substantial
degree. See Abbott v. Bragdon, 107 F.3d 934, 938-39 (1st Cir.
1997); Soileau v. Guilford of Maine, Inc., 105 F.3d 12, 15 (1st
Cir. 1997) (finding that plaintiff's dysthymia was not a
disability because it did not substantially affect a major life
activity).
                         On the facts of a specific case, a plaintiff
diagnosed with ADHD may have a mental impairment within the
17. The definition of a disability also includes (1) a
record of a mental or physical impairment, and (2) being
regarded as having such an impairment. 42 U.S.C. § 12102
(1994). Neither of these is applicable to this case.
                                                                       -3366-
meaning of the statute.                                          See 28 C.F.R. § 36.104 (1997). But
that impairment must also limit a major life activity to a
substantial degree. See Abbott, 107 F.3d at 941 (noting that
the determination whether someone has a disability "calls for
an individualized inquiry" regarding the particular plaintiff
in question) (citing 29 C.F.R. App. § 1630.2(j) (1996)).
Plaintiffs argued and the district court found that Jason's
ADHD affected to a substantial degree the major life activity
of learning.                        See 28 C.F.R. § 36.104 (1997) (defining major
life activities to include learning and working).                                                                                   We agree
that learning is a major life activity.
18. Although the relevant regulations do not specifically
list ADHD as an included physical or mental impairment, the
list is not exhaustive and includes "[a]ny mental or
psychological disorder such as mental retardation . . .
emotional or mental illness, and specific learning
disabilities . . . ." 28 C.F.R. § 36.104 (1997). ADHD is
not a learning disability per se.
            It is listed as a "mental disorder" in the American
Psychiatric Association's Diagnostic and Statistical Manual
of Mental Disorders (DSM-IV). We particularly note that the
DSM-IV admonishes that because of the "imperfect fit between
the questions of ultimate concern to the law and the
information contained in a clinical diagnosis[,] in most
situations, the clinical diagnosis of a DSM-IV mental
disorder is not sufficient to establish the existence for
legal purposes of a 'mental disorder,' 'mental disability,'
'mental disease,' or 'mental defect.' In determining whether
an individual meets a specified legal standard . . .
additional information is usually required beyond that
contained in the DSM-IV diagnosis. . . . It is precisely
because impairments, abilities, and disabilities vary widely
within each diagnostic category that assignment of a
particular diagnosis does not imply a specific level of
impairment or disability." DSM-IV at xxiii.
                                                                       -3377-
                         But the record shows that Jason never experienced
significant academic difficulties, and in fact has excelled
academically for most of his years at the Baldwin School.
Although Jason's hyperactivity and distractibility may affect
his capacity to achieve his absolute maximum learning and
working potential, there is practically no evidence that it has
substantially impaired his basic learning abilities. Under the
regulations for Title I of the ADA (which uses the same
definition                     of        disability                     as        Title              III),             a       person              is
"substantially limited" in a major life activity when he is
                         (i)          Unable              to        perform                a       major             life
                         activity that the average person in the
                         general population can perform; or [is]
                         (ii) Significantly restricted as to the
                         condition, manner or duration under which
                         [he] can perform a particular major life
                         activity as compared to the condition,
                         manner,                or        duration                  under             which             the
                         average person in the general population
                         can perform that same major life activity.
29 C.F.R. § 1630.2(j)(1) (1997). See also Soileau, 105 F.3d at
15-16 ("Impairment is to be measured in relation to normalcy,
or, in any event, to what the average person does.").
                         The most favorable evidence in the record for Jason's
claim that his learning ability has been substantially impaired
is that his grades dipped slightly during the Fall of his sixth
grade year -- his most severe period of behavioral unrest.
Even during that period, however, Jason's learning ability and
academic success did not fall below that of the average student
his age. In fact, his achievement remained consistently above
                                                                       -3388-
average.                   Under these circumstances, it would be error to
conclude that plaintiffs have met their burden of showing a
probability of success that Jason suffered a substantial
limitation of a major life activity.
                                                                           V.
                         This is a difficult case and we do not fault the
district court, which was operating in largely uncharted areas
of law and under considerable time pressure.                                                                                 There is a
practical and human problem about the remedy here and the
education of a very troubled young man. Jason is enrolled in
seventh grade at the Baldwin School only because of the
preliminary injunction, which was issued in error.                                                                             The school
requests that we immediately vacate the injunction to keep
Jason from continuing to disrupt its educational program.                                                                                        The
school will not, by reason of this opinion, any longer be
required to keep Jason as a student.                                                             But, in fairness, some
time for transition appears appropriate.
                         At oral argument in this case in November 1997, there
was lively questioning on the propriety of the issuance of the
injunction and the failure to send the case to arbitration. We
also explicitly asked plaintiffs' counsel what provisions his
clients were making should the injunction be vacated.                                                                                       Under
these circumstances, we order that portion of our mandate
19. What the school chooses to do voluntarily while the
matter is in arbitration is another matter.
                                                                       -3399-
vacating the preliminary injunction shall not issue until the
30th day from the date of this opinion. During this period the
Bercovitches may find another school for Jason, one better
suited, we hope, to meet his needs. Mandate shall issue in the
normal course reversing the order of the district court
refusing to compel arbitration and requiring that the case be
sent to arbitration.
                         Because the two claims which are the basis for
federal jurisdiction are to be sent to arbitration, the
district court shall consider whether the case should be
dismissed or stayed.                                    If the case is stayed, in light of this
opinion, there is no further basis on which plaintiffs may seek
injunctive relief during the stay.
20. Accordingly, the award of attorneys' fees to the
plaintiffs should be vacated as they are not prevailing
parties. Cf. 42 U.S.C. § 12205 (court, in its discretion,
may award attorneys fees to prevailing party in ADA action).
21. Section 3 of the FAA requires that where issues brought
before a court are arbitrable, the court shall "stay the
trial of the action until such arbitration has been had in
accordance with the terms of the [arbitration] agreement."
However, a court may dismiss, rather than stay, a case when
all of the issues before the court are arbitrable. See
Alford v. Dean Witter Reynolds, Inc., 975 F.2d 1161, 1164
(5th Cir. 1992); Sparling v. Hoffman Constr. Co., 864 F.2d
635, 637-38 (9th Cir. 1988); Sea-Land Serv., Inc. v. Sea-Land
of Puerto Rico, Inc., 636 F. Supp. 750, 757 (D.P.R. 1986).
Federal subject matter jurisdiction in this case is based on
a federal question, rather than diversity of citizenship.
Because we find that the two federal claims in this case --
those brought under the ADA and the Rehabilitation Act -- are
arbitrable, there is only pendent jurisdiction over the one
state-law claim. The district court therefore has discretion
to dismiss the entire action.
                                                                       -4400-
                         Costs to defendants.
                                                                       -4411-